IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MICHAEL BAVLSIK, M.D. and<br>KATHLEEN SKELLY,<br><br>**Plaintiffs,**<br><br>vs.<br><br>**GENERAL MOTORS LLC,**<br><br>**Defendant.** | Case No. 4:13-CV-00509-DDN |

# PLAINTIFFS' TRIAL BRIEF

This is a "crashworthiness" case. Also known as a "second collision" case. But best described as an "enhanced injury" case. Meaning, Plaintiffs are not alleging that GM caused the accident. Rather, Plaintiffs allege that the poor design of the subject vehicle caused an enhanced injury, above and beyond any injury that would have occurred absent the defect. Specifically, Plaintiffs allege that during this 11-15 mph, ¾ turn rollover, the design of the seat belt and/or roof caused Dr. Bavlsik's cervical spinal cord injury, leaving him quadriplegic. Put another way, rollover accidents are foreseeable. And GM has a duty "to use reasonable care in the design of its products to protect against an unreasonable risk of injury or enhancement of injury" in "the event of a collision." *Larsen v. Gen. Motors Corp.*, 391 F.2d 495, 504 (8th Cir. 1968). Thus, Plaintiffs advance negligence and strict product liability claims.

The facts are largely undisputed. Everyone agrees Dr. Bavlsik's head struck the roof before the roof hit the ground. And everyone agrees that if his head didn't touch the roof, he wouldn't be paralyzed. Plaintiffs have a (1) roof claim and (2) a seat belt claim. And, other than damages and the ultimate question of defect, there's really just one jury issue on each claim: (1)

1

whether the roof crushing contributed to cause the injury and (2) whether a better designed seat belt would have prevented head-to-roof contact. GM argues roof crush doesn't cause injury and that no seat belt design would have prevented the head contact. But there is one threshold legal issue: choice of law.

The subject vehicle was manufactured in Missouri, sold in Missouri, and driven in Missouri 99.9% of the time. Dr. Bavlsik resides in Missouri. And the relationship between GM and Dr. Bavlsik is centered in Missouri, where GM sold him the vehicle. Nevertheless, under the premise that the accident occurred in Minnesota, Plaintiffs believe GM will argue that Minnesota law applies. The real reason it will advance this argument, however, is its incorrect belief that Minnesota and Missouri law materially differ.

Missouri law clearly excludes all evidence of the cause of the accident. *Gerow v. Mitch Crawford Holiday Motors*, 987 S.W.2d 359, 363 (Mo. Ct. App. 1999) ("[A]ny error on the part of [Plaintiff] which might have caused the original accident is irrelevant in this enhanced injury case."). Minnesota courts do not appear to have addressed this issue. Nevertheless, GM believes that, no matter how irrelevant, Minnesota law would allow evidence of Dr. Bavlsik's fault. Also of note, but not material because cause of accident will be excluded, Missouri is a pure comparative fault state, Minnesota uses modified comparative fault.

Fortunately, the choice of law analysis—the "most significant relationship test"—leaves no doubt that Missouri law applies: "[T]he place of injury will not play an important role in the selection of the state of the applicable law . . . . when the place of injury can be said to be fortuitous or when for other reasons it bears little relation to the occurrence and the parties with respect to the particular issue." Restatement (Second) of Conflict of Laws § 145, cmt. e. (1971). Unfortunately, GM's best defense is to confuse and mislead the jury by tarnishing Dr. Bavlsik's

image. That's a lot easier than explaining why a 47 year old physician sustained a paralyzing injury in an 11mph accident. So it isn't likely to let this go without a fight. Thus, this brief will discuss (I) the facts (II) choice of law, and (III) Plaintiffs' claims. Evidentiary issues will be detailed in motions *in limine*.

I. **LOW SPEED ROLLOVER RESULTING IN A CERVICAL SPINE INJURY.**

Dr. Bavlsik was driving boy scouts home from a camping trip in Minnesota. Dr. Bavlsik's van clipped a towed boat while driving through an intersection. No one was hurt in the initial collision. Then the vehicle tipped over and rolled ¾ of a revolution through grass (to its passenger side, onto its roof, and onto the driver side) at a trip speed of 11-15 mph. It was a slow roll: it took about 3 seconds. The van did not vault—it stayed in contact with the ground throughout. Nor did it roll into an object. Dr. Bavlsik, then a 47-year-old physician, suffered a cervical spinal cord injury that rendered him quadriplegic. None of the other ten occupants of the van were injured. Plaintiffs allege negligence and defect because under these foreseeable and benign circumstances, Dr. Bavlsik sustained a paralyzing cervical spinal cord injury.

His injury was caused by one of two things: (1) the roof crushing above his head; or (2) the seat belt allowing enough excursion for his head to touch the roof (torso augmentation a/k/a diving). GM says roof crush doesn't cause cervical spine injuries. It admits that the injury occurred because Dr. Bavlsik's head made contact with the roof. But its defense is impossibility: it says no belt design could have kept Dr. Bavlsik's head from striking the roof. Yet it never tested the design in this van. Nor did it test any alternative designs in this van. And further belying its claim, eight years before selling this van, it tested designs used by other manufacturers and found that those designs significantly reduce excursion, thus reducing or eliminating the likelihood of head-to-roof contact. Finally, although it put a belt pretensioner in

the light duty version of this van, it chose not to put one in the heavy duty vans, like this one. Pretensioners significantly reduce excursion by tightening the belt and removing slack.

Thus, Plaintiffs allege negligent design/testing/warning and strict product defect, including failure to warn. Given GM's failure to act—despite knowledge of the defect and its cure—Plaintiffs will submit on punitive damages.

## II. MISSOURI LAW MUST BE APPLIED BECAUSE MISSOURI HAS THE MOST SIGNIFICANT RELATIONSHIP TO THE PARTIES AND CLAIMS.

This is a diversity case. Thus, the court "must follow the choice-of-law approach prevailing in the state in which it sits." *Dorman v. Emerson Elec. Co.*, 23 F.3d 1354, 1358 (8th Cir. 1994). "Missouri courts apply the most-significant-relationship test as defined in the Restatement." *Id.* "Section 145 of the Restatement establishes the general rule applicable to all torts." *Id.* Section 146 discusses personal injury actions. *Id.* And it establishes a presumption that "the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship." *Id.* (quoting Restatement (Second) on Conflict of Laws § 146 (1971)).

To determine whether another state has a more significant relationship, the contacts listed in Section 145 must be analyzed:

   (a) the place where the injury occurred,
   (b) the place where the conduct causing the injury occurred,
   (c) the domicile, residence, nationality, place of incorporation and place of
       business of the parties, and
   (d) the place where the relationship, if any, between the parties is centered.

*Id.*; Restatement (Second) on Conflict of Laws § 145(2) (1971). And if pertinent, the factors listed in Section 6 must also be considered:

   (a) the needs of the interstate and international systems,
   (b) the relevant policies of the forum,

> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

*Id.*; Restatement (Second) on Conflict of Laws § 6 (1971).

But most important—and, in fact, dispositive here—the Restatement explains that the location of the accident carries no weight when it is fortuitous: "[T]he place of injury will not play an important role in the selection of the state of the applicable law . . . . when the place of injury can be said to be fortuitous or when for other reasons it bears little relation to the occurrence and the parties with respect to the particular issue." Restatement (Second) of Conflict of Laws § 145, cmt. e. (1971); *see also Dorman*, 23 F.3d at 1360 ("The Restatement commentary advises that the place of the injury is unimportant to the selection of the applicable state law if it is fortuitous in that it bears little relation to the occurrence and the parties."). As *Dorman* explained, the place of injury is unimportant where the victim is traveling away from home through another state; it may be important when the injury occurs in the place where the product was purchased, the victim resides, and the product was used. *Dorman*, 23 F.3d at 1360.

"The doctrine of fortuitous injury is most commonly applied in product liability cases involving vehicles (or components thereof) that can be expected to travel freely—and to fail, causing injury—in jurisdictions that otherwise have no particular connection to the parties other than mere happenstance." *Elvig v. Nintendo of Am., Inc.*, 696 F. Supp. 2d 1207, 1211 (D. Colo. 2010). "[T]he place of injury becomes more significant to the conflict-of-laws analysis when it is something more than the place of injury, i.e., when there is some other basis for that state to have an interest in the litigation." *Jones ex rel. Jones v. Winnebago Indus., Inc.*, 460 F. Supp. 2d 953, 968 (N.D. Iowa 2006) (citing *Dorman*) (locus of injury in Idaho fortuitous where injury

5

involved defective camping trailer manufactured in Iowa and used by Colorado residents while vacationing).

Here, there's no doubt that the location of the accident was fortuitous. Dr. Bavlsik was driving home, to Missouri, after a camping trip in Minnesota. Bavlsik Dep. Ex. A, at 79:23-80:3. By chance, he was involved in an accident in Minnesota. Thus, **(a) the place where the injury occurred**, has no other connection to this case.

On the other hand, the vehicle was manufactured in Missouri, marketed in Missouri, and sold to Dr. Bavlsik in Missouri. GM's Response to Plaintiff's Interrogatory No. 5, Ex. B. Thus, **(b) the place where the conduct causing the injury occurred** is Missouri.

Dr. Bavlsik resides and practices in Missouri. Bavlsik Dep. Ex. A, at 7:18-9:4, 12:18-13:15. Dr. Bavlsik purchased the van from GM in Missouri. He and his family used the van in Missouri. And, although its headquarters isn't here, GM obviously does substantial business in Missouri through its manufacturing facilities and dealerships. Thus, **(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship between the parties is centered** is Missouri.

Every contact points to Missouri. Happenstance is the only connection to Minnesota. If the facts of this case do not rebut the initial presumption of Section 146, then there is no exception to that presumption. In other words, the restatement would be meaningless, Missouri would revert back to *lex loci delicti* (in direct defiance of the seminal Missouri choice-of-law case that adopted the Restatement, *Kennedy v. Dixon*, 439 S.W.2d 173 (Mo. 1969)), and no significant relationship analysis would ever need to be performed. That's simpler. But it certainly isn't the law. *See, e.g.*, *Murphy v. Mancari's Chrysler Plymouth, Inc.*, 948 N.E.2d 233, 241 (Ill. 2011) (accident in Michigan, but where parties resided and Plaintiff purchased vehicle,

Illinois, had most significant relationship); *Rosenthal v. Ford Motor Co.*, 462 F. Supp. 2d 296, 306 (D. Conn. 2006) (accident in North Carolina, but where car was sold, Connecticut, had most significant relationship); *Barton v. Hertz Corp.*, 35 F. Supp. 2d 1377, 1379-80 (M.D. Fla. 1999)) (accident in Arizona, but place where Plaintiff resided and rented car, Florida, had most significant relationship: "The mere happenstance of an accident's occurrence in another state does not create significant contacts for applying that state's law in a choice of law dispute."); *Bonti v. Ford Motor Co.*, 898 F. Supp. 391, 396 (S.D. Miss. 1995) aff'd, 85 F.3d 625 (5th Cir. 1996) (accident in South Carolina, but place where Plaintiff resided and purchased car, North Carolina, had most significant relationship); *Huddy v. Fruehauf Corp.*, 953 F.2d 955, 958 (5th Cir. 1992) (accident in Georgia, but place where Plaintiff resided, Texas, had most significant relationship); *Harris v. Berkowitz*, 433 So. 2d 613, 614 (Fla. Dist. Ct. App. 1983) (accident in Maine, but state where Plaintiff and Defendant resided had most significant relationship).

Finally, with respect to the Section 6 considerations, Missouri has a clear policy of protecting its residents from vehicles that cause enhanced injuries. *See e.g.*, *Gerow v. Mitch Crawford Holiday Motors*, 987 S.W.2d 359, 363 (Mo. Ct. App. 1999). Nearly all crashes are caused by driver fault. Thus, comparing the fault that *caused the accident* to the fault that *caused the enhanced injury* would eviscerate Missouri's policy of holding manufacturers responsible for enhanced injuries. Indeed, the crashworthiness doctrine would be rendered meaningless: manufacturers would have a duty to manufacture crashworthy cars only where the accident was no one's fault. Therefore, if GM is correct that Minnesota law would allow evidence of Dr. Bavlsik's fault, Missouri policy will be thwarted.

Missouri has the most significant relationship to this case. Its law must be applied.

## III. PLAINTIFFS' CRASHWORTHINESS CLAIMS.

"Manufacturers may be liable in negligence or strict liability for injuries sustained in a motor vehicle accident where a design or manufacturing defect, though not the cause of the accident, caused or enhanced the injuries." Crashworthiness Litigation § 1:1 (2d ed.). "In other words, the crashworthiness doctrine imposes liability on the manufacturer not for causing the accident, but rather for failing to minimize the injuries or even increasing the severity of the injuries sustained in an accident brought about by a cause other than the alleged defect." *Habecker v. Clark Equip. Co.*, 36 F.3d 278, 283 (3d Cir. 1994). "The doctrine contemplates two sets of injuries in the event of a collision involving a vehicle in a defective condition: injuries caused, in whole or in part, by the defect itself ('enhanced injuries'), and injuries not caused by the defect, such as the injuries an individual would inevitably sustain in the absence of any defect." *Giannini v. Ford Motor Co.*, 616 F. Supp. 2d 219, 221 (D. Conn. 2007).

In this case, the enhanced injury is clear: everyone agrees that Dr. Bavlsik would not have sustained a paralyzing cervical spine injury if his head did not come into contact with the roof. Indeed, everyone agrees he would not have sustained any injury at all. For the Court's convenience, the basic elements of Plaintiffs' claims are outlined below.

### A. STRICT LIABILITY

"One who 'sells' a 'product' in a defective condition, unreasonably dangerous to the user or consumer is subject to liability for injury caused by the defect." *Welkener v. Kirkwood Drug Store Co.*, 734 S.W.2d 233, 241 (Mo. Ct. App. 1987). "To prevail under this doctrine of strict liability, a plaintiff must prove that the product was defective and dangerous when put to a

reasonably anticipated use, and that the plaintiff sustained damages as a direct result of the defect." *Id.*; *see also* MO. REV. STAT. § 537.760.[1]

"Negligence is not an element of a products liability case." *Id.* And "liability is imposed on all those in the chain of placing a defective product in the stream of commerce, and the product need not be actually sold if it has been injected in the stream of commerce by other means." *Gunderson v. Sani-Kem Corp.*, 674 S.W.2d 665, 668 (Mo. Ct. App. 1984). Indeed, "no precise legal relationship to the member of the enterprise causing the defect to be manufactured or to the member most closely connected with the customer is required . . . ." *Id.* Rather, "it is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product which calls for the imposition of strict liability." *Id.*

A product can be defective based on its design and/or based upon the lack of an adequate warning. MO. REV. STAT. § 537.760.

      i. Design Defect

> (1) the defendant sold the product in the course of the defendant's business; (2) the product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use; (3) the product was used in a manner reasonably anticipated; and (4) the plaintiff was damaged as a direct result of the defective condition that existed when the product was sold.

34 Mo. Prac., Personal Injury and Torts Handbook § 38:2 (2013 ed.).

---

[1] (1) The defendant, wherever situated in the chain of commerce, transferred a product in the course of his business; and (2) The product was used in a manner reasonably anticipated; and (3) Either or both of the following:(a) The product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold; or(b) The product was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and the plaintiff was damaged as a direct result of the product being sold without an adequate warning.

####  ii. Failure to Warn

(1) the defendant sold the product in the course of defendant's business; (2) the product was unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics; (3) the defendant did not give adequate warning of the danger; (4) the product was used in a manner reasonably anticipated; and (5) the plaintiff was damaged as a direct result of the product being sold without an adequate warning.

34 Mo. Prac., Personal Injury and Torts Handbook § 38:2 (2013 ed.).

### B. NEGLIGENCE

Like strict liability, negligence product liability claims can be broken into design claims and failure to warn claims. A component of Plaintiffs' negligent design claim is GM's failure to test the restraint system as part of its design process.

####  i. Design Defect

Liability in products liability cases may be predicated on the theory of negligence. As liability arises in accordance with general principles of negligence, there must be a duty imposed on a manufacturer, seller, or other supplier, with respect to foreseeable dangerous consequences of a product; and the failure to adhere to such a duty constitutes fault, or negligence.

*Commercial Distribution Ctr., Inc. v. St. Regis Paper Co.*, 689 S.W.2d 664, 671 (Mo. Ct. App. 1985). Thus, a negligence claim for a defective product has four elements:

(1) The defendant manufactured or designed the product; (2) the product had a specific latent defect or hazard; (3) the defendant failed to use ordinary care to manufacture or design the product to be reasonably safe, and (4) the plaintiff was damaged as direct result of the defendant's negligent manufacture, or design.

34 Mo. Prac., Personal Injury and Torts Handbook § 38:2 (2013 ed.).

####  ii. Failure to Warn

The elements of a claim for failure to warn based in negligence are: (1) the defendant designed the product at issue; (2) the product did not contain an adequate warning of the alleged defect or hazard; (3) the defendant failed to use ordinary care to warn of the risk of harm from the alleged defect or hazard; and (4) as a direct result of the defendant's failure to adequately warn, the plaintiff sustained damage.

*Moore v. Ford Motor Co.*, 332 S.W.3d 749, 764 (Mo. 2011).

### C. PUNITIVE DAMAGES

"In a negligence action, punitive damages may be awarded if the defendant knew or had reason to know a high degree of probability existed that the action would result in injury." *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 164-65 (Mo. Ct. App. 1997). "To submit punitive damages to the jury in a strict liability case, a plaintiff must present evidence that the defendant placed in commerce an unreasonably dangerous product with actual knowledge of the product's defect." *Id.*

"Under both theories, evidence must also be presented that the defendant showed a complete indifference to or conscious disregard for the safety of others." *Id.* "Conscious disregard or complete indifference includes situations where the person doing the act or failing to act must be conscious from the knowledge of surrounding circumstances and existing conditions, that, although lacking specific intent to injure, the person's conduct or failure to act will naturally or probably result in injury." *Delacroix v. Doncasters, Inc.*, 407 S.W.3d 13, 42 (Mo. Ct. App. 2013) (internal quotations omitted).

Respectfully Submitted,

**THE SIMON LAW FIRM, PC**

By:    /s/ Kevin M. Carnie Jr.
John G. Simon, #35231MO
Kevin M. Carnie Jr. #60979MO
800 Market Street, Suite 1700
St. Louis, Missouri  63101
jsimon@simonlawpc.com
kcarnie@simonlawpc.com
(314) 241-2929
(314) 241-2029 / Facsimile
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 25th day of August 2015, the foregoing was filed electronically with the Clerk of the Court to be served via operation of the Court's electronic filing system to all counsel of record.

   /s/ Kevin M. Carnie Jr.