# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

MICHAEL BAVLSIK, M.D., and )
KATHLEEN SKELLY, )
                 )
           Plaintiffs, )
                 )
           v. )           No. 4:13 CV 509 DDN
                 )
GENERAL MOTORS LLC, )
                 )
           Defendant. )

## MEMORANDUM AND ORDER

This action is before the court upon the post-judgment motions of the parties. Plaintiffs have moved for a new trial under F. R. Civ. P. 59(a)(1)(A). (Doc. 196.) Defendant has moved for judgment as a matter of law under F. R. Civ. P. 50(b) or for a new trial under Rule 59. (Doc. 198.)

The court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332.

## BACKGROUND

Plaintiffs Michael Bavlsik, M.D., and Kathleen Skelly, his spouse, citizens of Missouri, commenced this action against defendant General Motors LLC following a motor vehicle collision on July 7, 2012 outside Detroit Lakes, Minnesota. Plaintiffs alleged that their 2003 GMC Savana van, manufactured by defendant, was defective and unreasonably dangerous in the design and manufacture of the driver's seat belt restraint system and of the van's roof above the driver's head. On that day, plaintiff Bavlsik was driving the van when it collided with a boat-loaded trailer being pulled by a pickup truck. Following the collision, the van skidded off the roadway, rolled three-fourths of a roll,

Dr. Bavlsik's head made contact with the roof above his head, and he was severely injured and rendered a quadriplegic.

Plaintiffs alleged claims of strict product liability, negligent product liability, and, for plaintiff Skelly who was not in the van a claim for loss of consortium resulting from the injuries to her husband. Plaintiffs asserted their claims based on an enhanced injury or second collision basis wherein the original cause of the initial collision with the pickup truck and trailer was not relevant to defendant's liability or to plaintiff Bavlsik's responsibility for his injuries. (Doc. 103.)

The court submitted plaintiffs' claims to a jury on a special verdict form: strict liability for product defect, negligent design that resulted in product defect, failure to warn of defective seat belt restraint system, and plaintiff Skelly's derivative claim for loss of consortium. (Doc. 189.) Plaintiffs withdrew their claim of product defect based upon the van's roof.

The jury made one finding of liability in favor of plaintiffs as follows:

defendant General Motors LLC [was] negligent in the design of the plaintiffs' 2003 Savana van, because the plaintiffs' 2003 Savana van seat belt restraint system: . . . (d) was not adequately tested by defendant[.]

(Doc. 189 at 3.) When asked whether the vehicle was defective because it lacked a frontal activated pretensioner, an all belts to seat system, or a sliding-clinching latch plate, the jury on both the strict liability claim and on the negligence claim, the jury answered each specification of defect "No." (Id. at 1, 3.)

Upon the single finding of negligent design due to the defendant's failure to adequately test the seat belt restraint system, the jury awarded plaintiff Bavlsik $294,164.00 for past physical and emotional pain and physical impairment, $576,701.00 for past health and personal care expense,[1] and $129,135.00 for past loss of earnings.

_____

[1] This amount was stipulated by the parties in the event the jury found in favor of plaintiff Bavlsik. (Doc. 158.) For this reason, this amount was filled in on the special verdict form by the court as a convenience to the jury in the event the jury found liability in favor

The total of plaintiff Bavlsik's damages awarded by the jury was $1,000,000.00. (Id. at 5.) The jury awarded no damages, past or future, to plaintiff Skelly. (Id. at 6.)

## II. JUDGMENT AS A MATTER OF LAW

Defendant's post-judgment motion for judgment as a matter of law under F. R. Civ. P. 50(b) follows its earlier similar motions under Rule 50(a) at the close of plaintiff's case and at the close of its case. (Doc. 175.)

At the close of plaintiffs' case, defendant moved for judgment under Rule 50(a) on three specific grounds: (1) plaintiffs did not show that the van was defective (Trial Tr. Vol. 6A, 95:25–96:5); (2) plaintiffs did not show what further testing should have been done and what defective condition that testing would have shown (id. at 96:6–11); and (3) regarding the failure to warn claim, plaintiffs did not show what the standard was, what the prevailing industry practice was, or what the warning should have stated. (Id. at 96:13–23.) The court denied the motion and defendant's case began. (Id., at 100.)

At the close of all the evidence, defense counsel orally renewed the earlier motion for judgment as a matter of law. He specifically incorporated the arguments made at the close of plaintiffs' case. He also argued that none of plaintiffs' alternatives for the product had been shown to be likely to have prevented plaintiff Bavlsik's injury. (Doc. 180, at 55-56.)

In ruling on the current motion, the court may (1) enter judgment on the jury's verdict; (2) order a new trial; or (3) enter judgment as a matter of law in defendant's

---

of plaintiff Bavlsik. There was no objection to this procedure. During deliberations the jury asked the court whether this amount would be awarded to plaintiff Bavlsik regardless of the jury's decision. (Doc. 192.) In response to the jury's question, in open court the court orally advised the jury that that amount had been agreed by the parties as the amount plaintiff had incurred for past health and personal care expenses and that the figure had been placed on the verdict form by the court only as a convenience to the jury in the event the jury, in answer to other questions, found defendant liable for past health and personal care expenses. (Tr. Vol. 12B, at 73.)

favor notwithstanding the jury's verdict.  F. R. Civ. P. 50(b).  If the court grants judgment as a matter of law, it must also conditionally rule any motion for a new trial.  Fed. R. Civ. P. 50(c).

"A court reviewing a Rule 50(b) motion is limited to consideration of only those grounds advanced in the original, Rule 50(a) motion."  <u>Nassar v. Jackson</u>, 779 F.3d 547, 551 (8th Cir. 2015).  Issues not included in a Rule 50(a) motion are waived and cannot be included in a Rule 50(b) motion.  <u>Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.</u>, 439 F.3d 894, 900–01 (8th Cir. 2006).

Now, in its post-judgment motion for judgment as a matter of law on plaintiffs' claim for negligent failure to test, defendant makes three arguments:  (1) under Missouri law there is no independent "duty to test" outside of proven manufacturing defects or latent defect claims; (2) a failure to test claim is dependent on a finding of a design defect, which finding the jury did not make; and (3) plaintiffs failed to submit legally sufficient evidence to support any of their claims.  (Doc. 199 at 4–9.)  Defendant's first argument in the current motion was not raised in its Rule 50(a) motions and is waived for consideration now.  <u>Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.</u>, 439 F.3d at 900–01.

Defendant's second Rule 50(b) argument was presented in the combination of its first and second Rule 50(a) arguments, i.e. that the failure to test claim was dependent upon the jury finding the existence of a defect in the seat belt restraint system, which the jury did not find.

As stated above, the jury found defendant liable for negligently designing the van because defendant did not adequately test the driver's seat belt restraint system.  In order to find defendant liable for the negligent design of the vehicle, Missouri law[2] required the jury to find the existence of facts which establish:  (1) a duty existed on General Motors'

---

[2] In its memorandum filed on October 9, 2015, the court stated its reasons why Missouri law supplied the rules of decision for this case.  <u>See</u> 28 U.S.C. § 1528;  (Doc. 195).

part to protect plaintiff from injury; (2) General Motors failed to perform that duty; and, (3) the plaintiff was injured because of the defendant's failure. Menz v. New Holland North Am., Inc., 460 F. Supp. 2d 1050, 1056 (E.D. Mo. 2006) (citing Scheibel v. Hillis, 531 S.W.2d 285, 288 (Mo. 1976) (en banc)). Missouri law does not require a plaintiff to submit alternative designs in a products liability case, although such evidence may aid the jury. Sappington v. Skyjack, Inc., 512 F.3d 440, 446 (8th Cir. 2008) (applying Missouri law).

The court agrees with defendant that plaintiffs' case for negligent design based upon the defendant's failure to test fails because the jury found that the plaintiffs' van was not defective in its seat belt restraint system. Although they are separate claims, strict products liability and negligent design are often inextricably entwined. "A verdict in favor of the defendant-manufacturer on the issue of strict liability, finding no defect in the product, would in some jurisdictions preclude recovery under the theory of negligence." McIntyre v. Everest & Jennings, Inc., 575 F.2d 155, 157 (8th Cir. 1978) (citing Browder v. Pettigrew, 541 S.W.2d 402, 404 (Tenn. 1976)).

The law of Missouri also requires a defect in the product to support a claim for negligent failure to test.

> "It is said that if the nature of a thing manufactured is such that, when lawfully used for the purpose for which it is manufactured, it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger and the manufacturer of this thing of danger is under a duty to make it carefully. And given an article which may contain a latent imperfection making the article reasonably certain to be a thing of danger (though it is carefully manufactured), *where it is shown that the imperfection could be disclosed by a test, it would seem reasonable that the manufacturer in the exercise of ordinary care would be under a duty to make the test.*"

Cohagan v. Laclede Steel Co., 317 S.W.2d 452, 454 (Mo. 1958) (quoting Zesch v. Abrasive Co. of Philadelphia, 183 S.W.2d 140, 145 (Mo. 1944) (italics added; interior reference to cites omitted).

Other courts have expressed the principle that a claim of negligent failure to test requires a defect in the product. See McIntyre, 575 F.2d at 159 (the jury's finding in favor of the defendant on the issue of strict liability precludes a finding for the plaintiff under either the theory of negligent design or negligent failure to test); see, e.g., Oddi v. Ford Motor Co., 234 F.3d 136, 144 (3d Cir. 2000) ("it appears that [plaintiff's] 'negligent failure to test' claim is, at bottom, nothing more than a routine products liability case based on negligence, and that the claimed negligence is the failure to test. . . . Thus, [plaintiff] must first establish that the vehicle was defective."); Mello v. K-Mart Corp., 792 F.2d 1228, 1233 (1st Cir. 1986) ("even if [seller] were negligent in respect to its testing of [product], that negligence could not have been the proximate cause of plaintiffs' injuries, because no amount of testing would have weeded out what, according to the jury, was a non-defective [product]").

Plaintiffs argue that, if the court concludes that a defect in the product is necessary for a negligent failure to test, then the special verdict findings by the jury of no defect yet the defendant negligently failed to test are inconsistent, and, therefore, a new trial must be ordered under F. R. Civ. P. 49(b)(4). (Doc. 203 at 1–4.)

The court disagrees, because the jury's findings on the special verdict form were not legally inconsistent. If the findings can be reasonably reconciled, they are not legally inconsistent and do not require retrial. Dairy Farmers of Am., Inc. v. Travelers Ins. Co., 391 F.3d 936, 945-46 (8th Cir. 2004); Lockard v. Mo. Pac. R. Co., 894 F.2d 299, 305 (8th Cir. 1990).

The case was submitted to the jury on the essential element of plaintiffs' claims, i.e., whether there was a defect in the vehicle's seat belt restraint system. The jury answered the special verdict questions on this issue in the negative. (Doc. 189 at 1–2.) When asked whether defendant negligently failed to adequately test the seat belt restraint system of the van, the jury answered in the affirmative. As set forth below, that

affirmative answer is supported by legally sufficient evidence. Defendant's witness admitted in a deposition played to the jury that it never tested the van's seat belt restraint system regarding driver movement during rollover events. The jury's finding of no defect rendered the other finding of negligent failure to adequately test a legally insufficient basis for liability. McIntyre, 575 F.2d at 159.

Therefore, the court grants defendant's renewed motion for judgment as a matter of law, because there is insufficient evidence to support a verdict for plaintiffs for negligent design based upon a failure to test.

### III. MOTION FOR A NEW TRIAL

The court now considers both parties' motions for new trials. Federal Rule of Civil Procedure 50(c)(1) provides,

> [i]f the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed. The court must state the grounds for conditionally granting or denying the motion for a new trial.

Plaintiffs seek a new trial on damages only or, in the alternative, on all issues. They argue that the damages findings are against the weight of the evidence and grossly inadequate. They also argue the special verdict was an impermissible compromise, and that defendant's expert improperly testified outside his previously disclosed opinions.

Defendant argues that the verdict was an improper compromise and that the court made incorrect evidentiary rulings.

### A. Inadequate Damages

Plaintiffs argue that the damages findings are both against the weight of the evidence and grossly inadequate. Defendant argues that damage awards are left to the discretion of the jury except in extreme cases and plaintiffs failed to carry their burden of

proving future damages and loss of consortium damages. The court agrees with plaintiffs.

"Although the appropriateness of a new trial is a federal procedural question decided by reference to federal law, in determining whether a state law claim damage award is excessive, state case law guides our inquiry." Niemiec v. Union Pacific R.R.Co., 449 F.3d 854, 858–59 (8th Cir. 2006). The question of damages is generally within the province of the jury. Blanks v. Fluor Corp., 450 S.W.3d 308, 407 (Mo. Ct. App. E.D. 2014). For the court to find the jury's award inadequate it must be "so shockingly inadequate as to indicate that it is a result of passion and prejudice or a gross abuse of its discretion." Tomlin v. Guempel, 54 S.W.3d 658, 660 (Mo. Ct. App. 2001) (quoting Leasure v. State Farm Mut. Auto. Ins. Co., 757 S.W.2d 638, 640 (Mo. Ct. App. 1988)). "It is the jury's duty to judge the credibility of witnesses and to weigh and value a witness's testimony. The jury's discretion includes accepting or rejecting all or part of the plaintiff's claimed expenses." Id. "The ultimate test for a jury verdict is what fairly and reasonably compensates the plaintiff for the injuries sustained." Riordan v. Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, 416 F.3d 825, 834 (8th Cir. 2005) (quoting Root v. Manley, 91 S.W.3d 144, 146 (Mo. Ct. App. 2002)).

Missouri courts have often found juries are justified in awarding zero damages for future pain and emotional suffering, when a plaintiff is adequately compensated for actual future damages. Riordan, 416 F.3d at 828, 832–34 ($1.18 million in past medical expenses, future medical expenses, and past non-economic damages acceptable even though zero awarded for future non-economic damages); Thornton v. Gray Auto. Parts Co., 62 S.W.3d 575, 580 (Mo. Ct. App. 2001) (award of $450,000 for all damages adequate even though that figure included only approximately $110,000 in possible future damages as well as pain and suffering); Root, 91 S.W.3d at 146–47 (only $100 in pain and suffering to one plaintiff and no pain and suffering for the other three not "grossly inadequate" because known medical expenses were awarded). An award for

medical damages and no pain and suffering can be suspect, but not always. <u>Id.</u>; <u>see also</u> <u>Davidson v. Schneider</u>, 349 S.W.2d 908, 913 (Mo. 1961). Non-economic damages such as pain and suffering are hard to quantify and best left to the jury's judgment. <u>Eich v. Bd.</u> <u>of Regents for Cent. Mo. State Univ.</u>, 350 F.3d 752, 763 (8th Cir. 2003) (quoting <u>Frazier</u> <u>v. Iowa Beef Processors, Inc.</u>, 200 F.3d 1190, 1193 (8th Cir. 2000)).

Plaintiffs argued for awards of substantial compensatory damages. Their counsel argued that Dr. Bavlsik's future care would cost $6,998,316.97. (Trial Tr. Vol. 3B, 100:13, Doc. 156.) During cross-examination of plaintiff's cost of care witness, Ms. Bond, defendant cited to National Spinal Cord Injury Statistical Center Facts as stating a fifty-year old would need approximately $2.1 million in future care costs. (<u>Id.</u> at 119:22–120:13). Plaintiffs' economics witness, Dr. Ireland, provided the jury with a chart documenting how much Dr. Bavlsik would lose in earnings depending on how many "work years" he lost due to his injuries. This estimate ranged from $296,000 (assuming Dr. Bavlsik worked until he was 67) to $5,804,251 (if he could no longer work starting immediately). (<u>Id.</u> at 131:20–132:25.) It was up to the jury to decide how long Dr. Bavlsik would be able to work, based on the medical evidence presented. (<u>Id.</u> at 132:15–21.)[3]

Regarding pain and suffering, plaintiffs' lawyer, in closing argument, suggested $5 million for past damages and $15 million for future damages. (Trial Tr. Vol. 12A, 95:23–96:7, Oct. 1, 2015, Doc. 190.) Defense counsel stated $35 million was the amount requested by plaintiffs' counsel during closing argument. (<u>Compare</u> Trial Tr. Vol 12A, 80:7–84:21, 90:18–98:9 <u>with</u> Doc. 200 at 5.) Nevertheless, the jury awarded zero dollars for plaintiff Bavlsik's future health and personal care expenses, physical and emotional pain and physical impairment, loss of earnings, as well as plaintiff Skelly's loss of companionship. (Doc. 189 at 6.)

---

[3] Plaintiffs concede that, although improbable, the jury could have decided that Dr. Bavlsik would work until age 67, resulting in no loss of earnings. (Doc. 197 at 1 n.1.)

Although in an appropriate case the awarding of no damages for physical and emotional pain and physical impairment, future loss of earnings, and loss of companionship might be sustained by the jury disregarding the evidence presented. However, in this case the award of zero dollars for future health and personal care expenses is shockingly inadequate. Although the jury could find that the plaintiffs overestimated the future medical expenses, an award of zero is unjust. Plaintiffs proved that Dr. Bavlsik suffered substantial past damages, based on a permanent injury that would require medical care of some sort for the rest of his life. Having found defendant liable for the life-altering injuries to Dr. Bavlsik, the jury was instructed that it

> must award plaintiff Michael Bavlsik such sum as [the jury believed] will fairly and justly compensate [him] for any damages you believe he has sustained and is reasonably certain to sustain in the future as a direct result of the occurrence mentioned in the evidence.

(Doc. 191, at 16.) And regarding plaintiff Kathleen Skelly, the jury was instructed:

> If you find in favor of plaintiff Michael Bavlsik on any or all of the aforesaid claims, and you further find that plaintiff Kathleen Skelly sustained damage as a direct result of the injury to her husband, plaintiff Michael Skelly, you must award plaintiff Kathleen Skelly such sum as you believe will fairly and justly compensate plaintiff Kathleen Skelly for any damage due to injury to her husband which you believe she has sustained and is reasonably certain to sustain in the future as a direct result of the occurrence mentioned in the evidence.

(Id.)

While there can be cases where juries' verdicts to withhold non-economic damages or to severely limit medical damages are not shockingly inadequate, this is not such a case. In the context of the trial evidence of this case, to totally eliminate future medical expenses is shockingly inadequate.

For these reasons, the court would grant a new trial only on plaintiff Bavlsik's future damages and on plaintiff Skelly's damages, past and future, if the court's granting of defendant's motion for judgment as a matter of law is reversed on appeal.

**B.    Compromise Verdict**

Plaintiffs and defendant argue that, if the court finds the jury's verdict was a compromise verdict, a new trial in its entirety is the only proper remedy.  (Docs. 197 at 7–8; 199 at 9–11.)  "A compromise verdict results when the jury, unable to agree on the issue of liability, compromises that disagreement by awarding a party inadequate damages."  Boesing v. Spiess, 540 F.3d 886, 889 (8th Cir. 2008).  Such a compromise verdict requires an entirely new trial.  Id.; Haug v. Grimm, 251 F.2d 523, 527–28 (8th Cir. 1958).

The court does not conclude that the jury's verdict was a compromise verdict.  A special verdict form was submitted to the jury so it could clearly report its findings regarding liability.  To the court's perception there is no question regarding the jury's limited finding of liability.  The jury found that defendant negligently did not adequately test the vehicle's seat belt restraint system.  (Doc. 189 at 3.)    Substantial evidence supports this finding.  Defendant's own expert, James White, testified in a deposition that General Motors did not test this vehicle's seat belt restraint system in order to find problems regarding excursion (movement of the belted driver in the driver's seat) in rollovers.  (Doc. 197-4 at 184:5–188:16.)  This deposition was played to the jury.  (Trial Tr. Vol. 5B, 6:17–7:13, Doc. 160.)

The court rejects plaintiffs' and defendant's arguments for a new trial based on a compromise verdict.


**C.    Evidentiary Grounds**

Both parties argue for different reasons that a new trial should be granted for various evidentiary rulings the court made.  Plaintiffs contend the court improperly allowed non-disclosed expert testimony of Dr. Thomas McNish, defendant's biomechanics expert.  (Doc. 197 at 8.)  Defendant contends that the court's denials of its

motions in limine Nos. 10 and 11 were improper and allowed inadmissible evidence to be published to the jury.

A new trial based on evidentiary errors is warranted only when, had it not been for the errors, the result of the trial would have been different. <u>Pointer v. DART</u>, 417 F.3d 819, 822 (8th Cir. 2005); Fed. R. Civ. P. 61. "No error in either the admission or the exclusion of evidence . . . is ground for granting a new trial . . . unless refusal to take such action appears to the court inconsistent with substantial justice." <u>Ladd v. Pickering</u>, 783 F. Supp. 2d 1079, 1086 (E.D. Mo. 2011) (quoting <u>Harris v. Chand</u>, 506 F.3d 1135, 1138 (8th Cir. 2007)).

### 1. Dr. McNish's Testimony

Expert opinions and their bases must be provided to the opposing party under Federal Rule of Civil Procedure 26(a)(2)(B). This allows opposing counsel to properly prepare their case and retain additional experts or evidence if needed. An expert cannot change his opinion in the middle of trial. <u>Voegeli v. Lewis</u>, 568 F.2d 86, 96 (8th Cir. 1977).

Plaintiffs argue that Dr. McNish, the defendant's biomechanics expert, substantially changed his opinions and added new bases for those opinions during the trial in violation of Rule 26(a)(2)(B). (Doc. 197 at 8.) Specifically, plaintiffs argue that Dr. McNish changed his definition of "normal driving position" between his expert report (Doc. 197-5 at 8), and his trial testimony. (Trial Tr. 10A, 50:14–51:10, Doc. 179.) Defendant counters that plaintiffs chose not to explore "normal driving position" during Dr. McNish's deposition and instead interpreted "normal driving position" in a manner inconsistent with Dr. Bavlsik's own testimony. (Doc. 200 at 9–10.) Furthermore, defendant argues that Dr. McNish's position remained consistent among his expert report, his deposition, and his trial testimony. (<u>Id</u>. at 10–11.)

Plaintiffs chose not to explore "normal driving position" during Dr. McNish's deposition. They were offered a second deposition of Dr. McNish after he released his supplemental report, but plaintiffs chose not to take defendant up on the offer. (Trial Tr. 10A, 11:11.) In response to the court's question outside the presence of the jury, Dr. McNish provided a definition of "normal driving position," that a driver is "seated behind the wheel and within a range of minor deviations within that seating position" and that the driver's bottom is in contact with the seat cushion, but "probably not full force against the seat cushion . . . ." (Id. at 50:18–24, 51:4–10.) Plaintiffs' counsel was afforded the opportunity to ensure that Dr. McNish's trial testimony would match the opinions in his report as well as his deposition testimony.

> [MR. HANSON, counsel for defendant]: Dr. McNish, if Dr. Bavlsik had applied the brake hard and actually lifted himself up as he said, would that cause you to say he was no longer in a normal driver's seated position at that time?
>
> [DR. MCNISH]: No, sir.
>
> [MR. SIMON, counsel for plaintiffs]: Your Honor, as long as he is not going to testify that putting his foot on the brake pulled him up out of the seat. I think we are all on the same page. That's my whole point.
>
> . . .
>
> MR. SIMON: Dr. McNish, in your report of June 27, 2014, you gave that opinion that we just covered, correct? That he was in his normal seated position; is that right?
>
> DR. MCNISH: I did.
>
> MR. SIMON: Okay. And at that time or prior to the time you prepared your report, you had an opportunity to receive and review completely Dr. Bavlsik's deposition, correct?
>
> DR. MCNISH: Yes, sir.
>
> MR. SIMON: Okay. And after reviewing his testimony and looking carefully at what he described he was doing prior to the accident you formulated this opinion, correct?

-13-

DR. MCNISH: Yes

MR. SIMON: And you've told the Court today that what you meant by normal seated or normal driving position is he was still in contact with the seat, despite the fact he had struck the boat, correct?

DR. MCNISH: He would have been in contact with but perhaps not compressing the seat cushion as forcefully as he would were he completely relaxed. I didn't say he was in a relaxed driving position.

MR. SIMON: And then –

DR. MCNISH: I would consider putting force on the brake which may relieve some of the pressure under your buttocks from the seat cushion as still being a normal driving position, depending on the situation.

MR. SIMON: It's your opinion in this case that that impact did not cause him to come out of his normal driving position, as you've described it correct?

DR. MCNISH: That's correct, sir.

(Trial Tr. 10A, 51:20–53:17.)

Additionally, plaintiffs argue Dr. McNish added an opinion[4] based on undisclosed testing. (Doc. 197 at 9.) Plaintiffs argue that Dr. McNish based his opinions regarding the alternative restraint systems only on the static testing performed in anticipation of this litigation. (Id. at 9–10.) Defendant counters that neither Dr. McNish's opinions nor the data he used were outside the scope of his reports, and plaintiffs' objection was untimely. (Doc. 200 at 10–12.)

Dr. McNish disclosed that he used Mr. Croteau's calculations in his own report, "Subsequent calculations by Mr. Jeff Croteau determined the vertical velocity of Dr. Bavlsik's torso at the time the subject vehicle driver's side roof rail struck the ground to

---

[4] Plaintiffs argue that Dr. McNish's opinion that no seat belt restraint system could support the 2600 pounds of pressure being exerted by the forces of the crash and Dr. Bavlsik (13 Gs of pressure multiplied by the approximate weight of Dr. Bavlsik, 200 pounds) was not disclosed prior to trial. (Doc. 197 at 10.)

have been 8.1 miles per hour, with an equivalent drop height of 2.2 feet." (Doc. 197-5 at 7.) Sources of his data and findings included: 2004 Savana Drop Test, Due Care Testing Under FMVSS 216 Roof Structure, Inverted Drop Test of 2005 Chevrolet Express 3500, SAE Article "Characteristics of Soil-Tripped Rollovers", "Drag Factors from Rollover Crash Testing for Crash Reconstruction", "Evaluation of Dynamic Roof Deformation in Rollover Crash Tests", and Roll Spit Testing. (Doc. 197-5 at 3–4.) In his supplemental report, dated March 13, 2015, Dr. McNish provided additional papers and testing as data sources for his findings. (Doc. 197-7 at 2.) Plaintiffs chose not to depose Dr. McNish regarding this supplemental report which addressed one of plaintiffs' expert's reports dated July 28, 2014. During his deposition on August 7, 2014, Dr. McNish spoke at length about the various forces, measured as newtons,[5] that would have been exerted on Dr. Bavlsik's neck during the rollover. (Doc 71-8.) Additionally, during trial, Dr. McNish testified, in detail, without objection, to the forces being exerted during the rollover:

> [MR. HANSON]: Now if we move on to the next slide, what do we have here? What are we adding to the equation now?
>
> [DR. MCNISH]: Well, we are adding an impact between the roof rail and the ground. And based upon the analysis done by Mr. Tandy and by Mr. Croteau, the velocity was of – the downward velocity was about 8.1 miles per hour. So we know that the roof rail strikes the ground. The vertical component of that strike is about 8.1 miles per hour. Which means that it stops. [Dr. Bavlsik's] head is already in contact with it or very close contact with that roof rail/roof area. And so from that we can determine that the downward acceleration of his body toward the ground, the deceleration that is created it goes from that 8.1 miles per hour downward to zero is about 13 Gs or 13 times Dr. Bavlsik's body weight.

---

[5] A "newton" is the amount of force required to accelerate one kilogram of mass one meter per second per second. https://en.wikipedia.org/wiki/Newton_%28unit%29 (viewed January 27, 2016).

Obviously you would subtract from that the weight of the head because it's stopped, but the weight of the mass that is continuing to move and to decelerate experiences about 13 Gs of deceleration during that.

MR. HANSON:  Now, did you evaluate Mr. Croteau's calculations to determine whether they are, in fact, conservative?

DR. MCNISH:  I did.

MR. HANSON:  What did you conclude?

DR. MCNISH:  In my opinion, they were a very conservative approach to analyzing the impact velocity.

MR. HANSON:  And you use those kinds of torso velocity calculations yourself routinely, do you not?

DR. MCNISH:  I do them and use them, yes, sir.

MR. HANSON:  You do them yourself sometimes?

DR. MCNISH:  Yes, sir.  It has to do with occupant kinematics. So, yes, sir.

MR. HANSON:  Now, so if it turns out that that 8.1 miles per hour is conservative and the velocity at impact with the ground was more, then you are going to get even more than 13 Gs?

DR. MCNISH:  More than that force or that -- if you just say for rough numbers you have 200 pounds that are being decelerated at 13 Gs, that's 2600 pounds that are being applied to the restraint system.

MR. HANSON:  So when you put somebody into a position like this illustration shows, are you now asking the body and the belts to deal with 13 times, at least, the body weight of the person?

MR. SIMON:  Your Honor, may we approach, please.

(Trial Tr. Vol. 10A, 115:23–117:13.)

Only at this point did plaintiffs object.  At this point the court held a sidebar discussion and plaintiffs argued that the specific forces being discussed were not previously disclosed.  The court overruled plaintiffs' objection and the direct examination of Dr. McNish continued.  Plaintiffs' objection was made after Dr. McNish had testified to the allegedly undisclosed opinions.

Even if plaintiffs had objected timely, the court finds that Dr. McNish did not change his opinions or change how he came to those opinions from his original expert report dated June 27, 2014, his deposition on August 7, 2014, or his supplemental expert report dated March 13, 2015.  Plaintiffs' motion for a new trial is denied.

### 2.    Defendant's Motions in Limine Nos. 10 and 11

Defendant argues that the court's denials of its motions in limine No. 10 (Doc. 116) and No. 11 (Doc. 118) were in error.  It argues that denial of motion in limine No. 10 allowed plaintiffs to admit improper hearsay documents in violation of Federal Rule of Evidence 803(18), the learned treatise exception.  (Doc. 199 at 12.)  It argues denial of motion in limine #11 allowed plaintiffs to suggest an improper standard of care for a product manufacturer, under Missouri law.  (Id. at 13.)

The court heard oral argument on September 4, 2015, and issued a written order on September 8, 2015.  (Doc. 147.)  Motion in limine No. 10 was denied as moot with leave to refile after counsel for both sides conferred about which documents the parties will seek to admit under Rule 803(18).  (Id. at 3.)  Motion in limine No. 11 was denied with leave to raise the issue as needed at trial.  (Id.)  Neither motion in limine was refiled thereafter before trial.  (See generally CM/ECF docket entries 148–150.)

A court's ruling on a motion in limine is only appealable in those instances where the court makes a definitive ruling on a fully briefed and argued motion and that ruling affects the entire course of the trial.  Spencer v. Young, 495 F.3d 945, 949 (8th Cir. 2007).  If there is no definitive ruling on a party's motion in limine, then the party must object at trial to preserve the issue.  Ross v. Douglas Cnty., Neb., 234 F.3d 391, 394 (8th Cir. 2000).  Without objection, the matter is reviewed for plain error and a verdict will be set aside only if the error prejudices the substantial rights of a party and a miscarriage of justice would result if the verdict stands.  Spencer, 495 F.3d 945, 949 (8th Cir. 2007);

<u>Bady v. Murphy-Kjos</u>, Civ. No. 06-2254 (JRT/FLN), 2009 WL 3164793, at *6 (D. Minn. Sept. 29, 2009).

The court did not make a definitive ruling on defendant's motion in limine No. 10. The court ruled that defendant had "leave to refile" the motion. (Doc. 147 at 3.) Defendant did not refile the motion, but did raise the issue several times during trial. The court allowed plaintiffs to read portions of learned treatise papers to the jury, after each was "established as a reliable authority by the expert's admission or testimony . . . ." F. R. Evid. 803(18)(B). The court did prohibit these learned treatise and papers from being admitted into evidence. Plaintiffs' Exhibit 285, a paper co-authored by plaintiffs' expert Larry Sicher, was allowed to be read to the jury, but excluded from being formally received as an exhibit.

MR. SIMON: And that article was from 2006; is that right?

MR. SICHER: Yes.

MR. SIMON: Okay. You're one of the authors, right?

MR. SICHER: Right.

MR. SIMON: And is this an article that is typically relied on by members of your profession?

MR. SICHER: Yes

MR. SIMON: And --

MR. HANSON: Your Honor, there's no foundation about who else relies upon it. Objection.

THE COURT: I'm going to overrule that objection.

MR. SIMON: Okay. And, Mr. Sicher, you do research, right?

MR. SICHER: Yes.

MR. SIMON: And you look up and research articles, correct?

MR. SICHER: Yes.

MR. SIMON:  And those articles are technical articles, engineering articles, articles from different engineering publications, correct?

MR. SICHER:  Yes.

MR. SIMON:  Including the Society of Automotive Engineers, correct?

MR. SICHER:  Yes

MR. SIMON:  Okay.  And that's something you routinely do through the course of your career, right?

MR. SICHER:  Right.

MR. SIMON:  Okay.  And is this one of those articles that engineers would typically research, rely on and use in the course of their research?

MR. SICHER:  Yes

MR. SIMON:  Okay.  And let's -- let's go, please, to Exhibit 285.  Okay.  And is this the article?

MR. SICHER:  Yes.

MR. SIMON:  Okay.  And you're one of the authors.  It says there Larry Sicher.

MR. HANSON:  Your Honor, object to displaying this to the Jury.

THE COURT:  Step up to the sidebar, please.

A bench conference was held on the record and outside of the hearing of the Jury as follows:

THE COURT:  Okay.  The objection is what?

MR. HANSON:  The rules don't permit you just to pull out a document and show it to the jury just because somebody says they rely upon it.  That's not what the learned treatise evidentiary rule is.  It's 803(18).  This is not a proper use of a technical paper.

MR. SIMON:  Your Honor, I laid proper foundation for it.  He's relied upon it.  We're going to the portion of the article that he relied on.  We're going to present it to the Jury.  I've laid proper foundation.  It's proper evidence in this case.

MR. HANSON:  Well, it can't be received into evidence, but it can be read in.

MR. SIMON:  I'm not moving to --

MR. HANSON:  Well, it's sort of the same thing when you display it to the Jury.

MR. SIMON:  Well, I'm not moving to have it admitted.

THE COURT:  All right.  Now, there has not been one exhibit used in direct examination in the plaintiffs' case and in cross-examination by defense where exhibits have been offered and received by the Court.  Not one.  I've been -- you know, the perception of the Court is that objections to exhibits have been discussed with counsel, but that's not the point.  This exhibit has not been offered, and what do you intend -- how do -- how would you --

MR. SIMON:  I intend to offer it.  I intend to offer it and show a small portion, publish a small portion to the Jury, and I'm not intending to ask that the Jury receive it at the end of the case but just that it be admitted for limited purposes with this witness.

MR. HANSON:  And I think the rule explicitly says you can't offer it as an exhibit; you can merely read from it.

THE COURT:  Okay.  He can read from it.  Don't offer it.  You can display it to the Jury because that's nothing more than an aid in having it read to them.  I'll overrule the objection.

(Trial Tr. 4A, 53:25–56:24.)

When plaintiff's counsel attempted to have it admitted into evidence, the court denied the request, ruling,

[w]ell, as I understand the Rule of Evidence, what it does, it allows the jury to consider the witness' expertise, but it does not allow the learned treatise to be received in evidence as substantial evidence to support a verdict.  And so that's my understanding.  It can be a basis for the opinion, and the opinion can be substantial evidence to support a verdict, but the learned treatise, such as that, would not.  So I'm going to sustain the objection about receiving it into evidence.

(Trial Tr. 4B at 26:23–27:6, Sep. 17, 2015, Doc. 161.)  This happened again with plaintiffs' Exhibit 223, a technical article on pretensioners (a device which automatically causes a seat belt to tighten in a collision)  partially authored by General Motors.  (Trial Tr. 4B, 43:7–19.)

While the court may have been in error about not formally admitting these exhibits into evidence, there would have been no different outcome had the court formally admitted the exhibits into evidence.  This is because the court allowed counsel to use the materials in questioning and by them being read to the jury.  See Fed. R. Evid. 803(18).

The court did not make a definitive ruling on defendant's motion in limine No. 11.  However, the court specifically ruled defendant had "leave to raise the issue as needed at trial."  (Doc. 147 at 3.)  Defendant did object to either its corporate representatives or plaintiffs' experts rendering an opinion on what a manufacturer should do when designing a product, thereby preserving this issue for review.  (See, e.g., Trial Tr. 3B, 5:11–7:18, 8:9–9:17; Trial Tr. 4A, 58:5–11, Doc. 161.)  Lay and expert witnesses may offer their opinions to a jury if they will help the jury decide the facts.  F. R. Evid. 701(b), 702(a).  Furthermore, "an opinion is not objectionable just because it embraces an ultimate issue."  F. R. Evid. 704.

In the present case, witnesses were questioned about what manufacturers "should" do, particularly if they know of a certain injury.  Plaintiffs submitted a negligence claim, which required them to show that General Motors' actions were not reasonable.  Sapp v. Morrison Bros. Co., 295 S.W.3d 470, 485 (Mo. Ct. App. 2009) (citing Blevins v. Cushman Motors, 551 S.W.2d 602, 608 (Mo. 1977) (en banc)).  Therefore, the witnesses were within Rules 701 and 702 when they opined about whether they found defendant's actions reasonable based on their research.

## IV. CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the motion of defendant for judgment as a matter of law (Doc. 198) is sustained.

**IT IS FURTHER ORDERED** under Federal Rule of Civil Procedure 50(c) (1) that, if the United States Court of Appeals for the Eighth Circuit reverses the court's judgment in favor of defendant as a matter of law, the motion of plaintiffs for a new trial (Doc. 196) is sustained only on the issue of future damages for plaintiff Michael Bavlsik, M.D. and on all damages for plaintiff Kathleen Skelly.

An appropriate Judgment Order is issued herewith.


_____/s/ David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on January 29, 2016.